## McKENZIE *v.* EGGE

[No. 70, October Term, 1954.]

2

*Order directing reargument on appeal filed March 24, 1955.*

*Decided April 13, 1955.*

The cause was reargued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON AND HAMMOND, JJ.

*Alleck A. Resnick,* with whom was *Jacob Kartman* on the brief, for the appellant.

*Frank T. Gray* and *Michael P. Crocker,* with whom were *Piper & Marbury* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment for the defendant, entered upon motion for a directed verdict, in an action by a tenant against her landlord for injuries sustained on July 5, 1953, in a fall from the second story porch of her apartment.

The appellant, a young woman about twenty-six years old, originally occupied a first floor apartment in the premises, 2226 Eutaw Place, with her husband and two small children, but the husband left and in September, 1952, she moved into a furnished, second floor, rear apartment, which was smaller and less expensive. There were six apartments in the building, the landlord residing in a third floor, front apartment. Evidently there was no written lease. The testimony was that she paid $13.00 each week for the apartment, directly to Mr. Egge. He encouraged her to move, as she was in arrears in her rent for the larger apartment, and helped move her trunks. The smaller apartment consisted of one large room, used as a bedroom and a sitting room, a small bathroom and a kitchenette. A door in the center of the rear wall of the apartment gave access to a back porch. Whether the porch was included in the demised premises, or retained by the landlord for the common use of tenants, is not entirely clear. There was a stairway leading from the porch to the ground, and also to the third floor.

The appellant testified in regard to her use of the porch: "I had clotheslines to hang my baby's diapers on, and also a rubbish can tied to the railing and at the back of the porch there was a railing that was screened in, you could use that to cover your rubbish, and the usable portion of the porch was on the left side at the left of the stairway, going up and down." The porch was enclosed by a railing described by the appellant as, "a long, thin board on top and a board on the bottom with slats * * * in between * * *."

The appellant testified that when she moved into the apartment she noticed that the porch was shaky and

that "three or five slats" were missing from the railing along the left side. She was afraid her children might fall through the openings, and later put the window screens over them. The day after she moved in, Mr. Egge said he would look at the porch and would fix it. "At various intervals, when I would pay my rent I would mention the skakiness of the porch and tell him another slat had fallen out and it was getting worse each time I noticed it." This happened four or five times. The last time she remembered talking to him about it was in the beginning of June, 1953. On the evening before the accident she had dinner with the landlord in his apartment, with Mrs. Piper, another tenant. He had just fixed up Mrs. Piper's apartment, and promised to start working on hers, for he said, "I haven't done anything for you." She told him she was concerned about the porch, that it was dangerous, and asked him to fix that before he did anything else. She testified at that time the top rail had come loose, where it joined the building.

Mr. Egge had been on her porch many times, using the stairway. Sometimes he had carried her trash down the stairs. He had also rigged up a pulley and rope, whereby she could lower her trash can from the porch to the ground, which she used every day. It was necessary to lean on or over the rail to bring the can in or out. This pulley was over the shaky railing at about the center on the left side of the porch. Nearly every day he would dump the contents, after she had lowered the can, into a larger container for removal by the city collectors. On one occasion he picked up some slats that had fallen to the ground from the railing, and asked her to keep them. Apparently he performed the work of a janitor as well as a landlord and made all repairs himself.

Another tenant, Mrs. Willett, testified she overheard Mrs. McKenzie tell Mr. Egge about the condition of the porch in June, 1953, "when she paid the rent". He said, "Yes, I will take care of it when I get around to it." Mrs. Piper also testified she heard Mr. Egge promise to fix the porch for Mrs. McKenzie.

Mr. Egge denied that he was ever told about the condition of the porch, or the missing slats, or had any knowledge that the railing was defective. He testified he stood with one foot on a ladder and one foot on the railing in April, 1953, when he fixed a downspout at the corner next to the house. For present purposes, of course, we must consider the testimony most favorable to the plaintiff.

The accident occurred in this manner. Mrs. Piper was having breakfast with Mrs. McKenzie, as they were going to take a trip together that day. When breakfast was ready, they called the children who were outside. Donnie was on the porch, playing, but Michael was not there. Mrs. Piper and Mrs. McKenzie went out on the porch to look for the child, Mrs. Piper going to the right, Mrs. McKenzie to the left. Appellant testified she was worried about the boy, "* * * I went to the left and I approached the railing and laid my arm on it, and just then I saw Michael down below, and I had opened my mouth to call to him and before I could call to him the whole side of the porch gave way." The place where she was standing was about midway between the pulley and the corner post, three-quarters of the way from the wall. Mrs. Piper testified: "Mrs. McKenzie was standing there with her hand on the rail in a bent position but didn't look to me as though she was leaning on it, and all of a sudden this loud crash came and Mrs. McKenzie went sailing through the hole * * *." Mr. Cobum, who saw the porch just after the accident, testified the whole railing had fallen out; "some of it looked like it was dry rot".

It is well settled in Maryland that under certain conditions a tenant may maintain an action for injuries sustained as a result of a defect in rented premises, despite the absence, at common law, of an implied covenant to repair or a warranty of the fitness for occupancy of leased premises. These conditions are, that there be a contractual undertaking to make repairs, notice of the particular defect, and a reasonable opportunity to

correct it. Where these conditions are met, there arises an obligation to use reasonable care to make the repairs, for the negligent breach of which there is a tort liability, subject to the usual rules as to proof of causation and the absence of contributory negligence on the part of the tenant. *Thompson v. Clemens,* 96 Md. 196; *Pinkerton v. Slocomb,* 126 Md. 665; *Robinson v. Heil,* 128 Md. 645; *Edelman v. Monouydas,* 186 Md. 479; *King v. Compton,* 187 Md. 363. It has been stated that this is a minority view. *Prosser, Torts,* p. 659 *et seq.;* 1 *Am. Law of Property,* § 3.79; 1 *Tiffany, Real Property* (perm. ed.), § 106; *Huey v. Barton,* 44 N. W. 2d 132 (Mich.); Note, 163 A. L. R. 300. However, it is the rule adopted by the American Law Institute. *Restatement, Torts,* § 357. It may be noted that tort liability predicated upon a contractual obligation is not without precedent. Cf. *Otis Elevator Co. v. Embert,* 198 Md. 585, and cases cited. For a good discussion of the principles involved, see *Dean v. Hershowitz,* 177 A. 262 (Conn.). The rule is too firmly established in this State to require any extended discussion. Where parts of an apartment dwelling are retained under the control of a landlord, for the common use of tenants, the landlord is under an implied duty to use reasonable diligence to keep the portions retained in a safe condition. *Ross v. Belzer,* 199 Md. 187, and cases cited.

The appellee contends that there was no consideration shown for the alleged promise to repair, and no evidence that the landlord had notice of the particular defect that caused the accident. On the first point, it was admitted that payments were made weekly; the landlord entered them in a book he kept for the purpose. Presumably this would create a tenancy from week to week. 3 *Thompson, Real Property* (perm. ed.), § 1068; *Darling Shops v. Balto. Center,* 191 Md. 289, 293; *Garner v. La Marr,* 76 S. E. 2d 721 (Ga.); Charter & P. L. L. Balto. City (1949 ed.), § 729. It has been held in some cases that where an occupant of furnished quarters is a lodger and not a tenant the relationship alone may furnish a basis of

8

tort liability. See *"Tenant, Lodger and Guest"*, 64 Yale L. Journ. 391, (Jan. 1955), and cases there cited. The circumstances that the owner resides in the premises and furnishes services have been considered as evidence of an intention not to create a tenancy with its common law incidents. Assuming, however, that Mrs. McKenzie was a tenant, and that the accident occurred on a portion of the premises over which she had exclusive control, it is necessary to establish a contractual obligation supported by legal consideration.

It is recognized that any benefit moving to the promisor will suffice, if it is not one which the opposite party was already legally bound to render. *Banking Co. v. Fid. & Dep. Co.*, 165 Md. 657, 675. In *Robinson v. Heil*, *supra*, the promise to repair was made contemporaneously with the initial occupancy and payment of rent, and this was deemed sufficient although the promise was not repeated upon subsequent payments. But in *Minneker v. Gardiner*, 191 N. E. 793 (Ohio), it was held that a subsequent promise was referable to the tenant's possession under a month to month lease, and there was no consideration shown. In *Papallo v. Meriden Sav. Bank*, 24 A. 2d 472, 473 (Conn.), it was said: "A promise to repair made to induce a person to become a tenant or, after the tenancy has commenced, to induce the tenant to remain for a longer or for a new or additional term is based upon a sufficient consideration * * *. If, however, the promise is made after the tenancy has already commenced and during the term of the lease, and the tenant is not thereby induced to stay for a longer term, or a new term, but only to continue for the term already commenced and pay the rent which he has already contracted to pay, the agreement to repair is without consideration." In that case the tenancy was from month to month and the court held that there was no consideration shown, since it did not appear when the promise was made.

In the *Papallo* case, however, there was testimony of a threat to move unless the repairs were made. It has

been held in many cases that a promise made in the face of a threat to move, or a request by the landlord that the tenant remain, is supported by consideration. *Thompson v. Clemens, supra; Edelman v. Monouydas, supra; Hart v. Coleman,* 78 So. 201 (Ala.) ; *Ehinger v. Bahl,* 57 A. 572 (Pa.) ; *Good v. Von Hemert,* 131 N. W. 466 (Minn.) ; *Stevens v. Yale,* 127 A. 283 (Conn.) ; 32 Am. Jur. § 707.

In 1 *Tiffany, Landlord and Tenant,* § 87 e(3), p. 600, it is said: "And there is, no doubt, a sufficient consideration if the tenant has a right to relinquish possession owing to the condition of the premises, and the lessor agrees to make the repairs in consideration of the tenant's consent to remain." In the instant case there was, of course, no promise until after the tenant had moved in, nor was there a threat to move. However, there was testimony that repeated promises were made contemporaneously with the payment of rent. The tenant clearly had the option each time, of giving notice of her intention to move upon the expiration of the required period. Perhaps she would have had a right to move without notice, for breach of his previous promises to repair. The promises were inducements for her to remain and, in effect, renew the lease for an additional period. We think the payment of rent and continued occupancy under these circumstances was a sufficient benefit moving to the promisor to constitute a legal consideration, even in the absence of a direct threat by her or request by the landlord. In *Maday v. N. J. Title Co.,* 28 A. 2d 104 (N. J.), it was said that where there is a right to terminate, the fact of remaining in occupancy on the strength of a promise to repair is a sufficient consideration. It was noted that the terms of the tenancy, in that case from month to month, would have a bearing on the question of the tenant's right to terminate, and it was pointed out that the accident did not occur until more than a month later. The case of *Talley v. Curtis,* 129 S. W. 2d 1099, 1102 (Tenn.), relied upon by the appellee, is distinguishable upon its facts, since the one statement relied on was

10

made during the fixed term of the lease and was only an expression of intention.

On the point that the landlord's attention was not called to the particular defect, we note that while the initial complaint was as to the slats, through which she feared her children might fall, there was testimony that she called the landlord's attention to the progressive deterioration, that he actually handed her some of the newly fallen slats, and that she complained particularly of the shakiness of the rail over which the pulley was located, within a few feet of the point from which she fell. We think there was legally sufficient evidence to raise the duty to repair and to take the case to the jury on the issue of primary negligence.

The appellee earnestly contends that there was clear evidence of contributory negligence or assumption of risk. It is argued that she is impaled upon the horns of a dilemma; the stronger the evidence of notice by her to the landlord of the particular defect, the clearer becomes her duty to avoid the use of the facility which she knows to be dangerous. But it does not follow that because she knew of the defective condition and complained of it, she was necessarily aware of the full extent of the risk. Cf. *Dean v. Hershowitz, supra.* The testimony was that she did not do more than place her arm on the rail, that she did not lean on it as she did when operating the block and tackle. Mrs. Piper testified that she did not appear to lean on the rail. Whether her action was so negligent under all the circumstances as to bar recovery would seem to present a question for the jury, as in *Edelman v. Monouydas, supra,* where the tenant knew that the window cord was frayed, but not that it would break without warning in the act of raising the window.

The appellee attempts to distinguish the *Edelman* case on the ground that in that case there was an absolute necessity that the window be opened for ventilation purposes. It may be noted, however, that there was evidence in that case that the tenant's purpose in opening

the window was to wash it, and it was not the only window. The question of necessity is one of the factors that the jury may consider in determining whether the action of the plaintiff is reasonable under the circumstances and amounts to due care. The rule is thus stated in *Restatements, Torts*, sec. 473: "If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he knowingly exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in so doing unless the risk is unreasonable." In comment b., it is stated that among other factors to be considered is the existence of an alternative method by which the right or privilege could be exercised. See *Sezzin v. Stark*, 187 Md. 241, 253, citing *Edelman v. Monouydas, supra*. See also *Lebovics v. Howie*, 11 N. W. 2d 906 (Mich.). These cases are perhaps not in point on the issue of primary negligence, but they are persuasive on the issue of contributory negligence.

It was stated in *Thompson v. Clemens, supra* (p. 210), that if the plaintiff knew of the dangerous condition of the porch and "used it without any more necessity for doing so than is disclosed by this record, then unquestionably she would have been precluded from recovery, on the ground of contributory negligence." The evidence indicated that the plaintiff was using the porch to reach a toilet in the back yard, although she might have reached it by means of the front door and an alley. We must disapprove the sentence quoted, if it can be taken to mean that she was guilty of contributory negligence as a matter of law. In fact, the decision was rested squarely on the ground that there was no proof of notice of the particular defect and no primary negligence. The court stated (p. 211) "therefore without discussing the question of the contributory negligence of the plaintiff, we will affirm the judgment." In *Robinson v. Heil, supra*, there was testimony that the defective stairs were the only means of ingress or egress, but the court did not

stress this point in the opinion, In *Edelman v. Monouydas, supra,* there were other alternatives.

In the instant case, the question of contributory negligence depends, as we have said, upon the reasonableness of the plaintiff's action under all the circumstances. It would be unreasonable to expect that she should forego all use of the porch, which was a necessary adjunct to her housekeeping operations, as was well known to the landlord. In effect, he invited or required her to approach the rail every time she disposed of her trash. The fact that she approached it this time for the purpose of locating her child would not bar recovery as a matter of law, it, as she testified she did so with due regard to the known defect. We think the issue was one for submission to the jury.

*Judgment reversed, and case remanded for a new trial, with costs.*