MARYLAND STATE FAIR AND AGRICULTURAL
SOCIETY, INCORPORATED *v.* RIDGELY
LEE ET AL.

[No. 1135, September Term, 1974.]

*Decided December 4, 1975.*

The cause was argued before MOYLAN and LOWE, JJ., and JOHN C. ELDRIDGE, Associate Judge of the Court of Appeals of Maryland, specially assigned.

*John H. Bolgiano*, with whom were *Smith, Somerville & Case* on the brief, for appellant.

*John H. Zink, III*, with whom were *Cook, Murray, Howard & Tracy* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This is an action for damages resulting from the death of Aimee Britton when she was thrown from a runaway horse on the defendant's premises.

In April 1971 Ridgely Lee, a horse breeder and trainer, applied to stable horses at Pimlico Race Track for upcoming race events there. Because the available stalls were filled, the Pimlico Racing Secretary assigned her to accommodations at her second preference, Timonium Fair Grounds. Mrs. Lee accepted the assignment since it was closer to her home than the other available sites at Bowie or Laurel and because it was the preference of her twenty-four

year old daughter, Aimee Britton. Additionally, Mrs. Lee testified that the alternative sites would "most likely" be exhausted by the time she appealed the Secretary's decision and requested another racetrack.

The Timonium racetrack facility is comprised of an oval track elevated approximately five feet above the barn area. The barns, located south of the track, were separated by asphalt paving from the track entrance. To the east the barns were bordered by an approximately three and one-half foot high stone wall which separated the stabling area from York Road, a public highway.

On the morning of April 14, 1971, Mrs. Lee's daughter, Aimee Britton, was preparing to exercise one of her mother's horses. Aimee had about 8 to 10 years' riding experience, including previous experience at Timonium. She rode the horse from her mother's assigned barn to a track entrance about 500 feet east of the barn; a closer and allegedly safer "paddock gate" was kept closed by the track authorities during the training hours. The track entrance was composed of an area enclosed by two gates, and was connected to a "chute" through which Aimee proceeded on her horse in order to enter the elevated track. According to Mrs. Lee, who witnessed Aimee's attempt to enter the track, a gust of wind blew sand and dirt which hit the horse, causing it to become slightly "fractious." The horse backed out of the entrance and, after a horse already on the track had passed, Aimee again attempted to enter the track. The horse became "more frightened," and again backed "sideways" out of the chute. The horse was then going in circles in the area between the two gates, and, despite Aimee's attempt to direct it towards the track area, it went out of the gate area towards York Road. In so doing, the horse had to traverse an asphalt path which separated the gate entrance from York Road. It then "hit the asphalt surface which also had sand on it, slipped and when it slipped, it panicked, and went in a straight line towards the wall at York Road." As the horse jumped over the wall, Aimee fell off the horse and struck her head on the stone wall. She died a week later from the injuries to her head.

Ridgely Lee. individually and as personal representative of the estate of Aimee Britton, filed suit against the Maryland State Fair and Agricultural Society, Inc., the owner of the Timonium racetrack facility (hereinafter referred to as "Timonium"), in the Circuit Court for Baltimore County (Maguire, J.). The suit alleged that Timonium negligently maintained the racetrack and negligently permitted certain hazardous conditions to exist which caused the injuries to Aimee.

At the trial, after the presentation of the plaintiff's case, and again at the close of all the evidence, Timonium moved for a directed verdict, contending that (1) as a matter of law, the alleged defective conditions were open and obvious to Aimee, and therefore the defendant is not liable for injuries resulting from those conditions; (2) there was no legally sufficient evidence of negligence on the part of Timonium which caused or contributed to the accident; and (3) the sole proximate and legal cause of the injury was the runaway horse ridden by and in the sole control of Miss Britton.[1] The trial judge rejected the contentions, permitting four allegations of negligence to go to the jury: (1) the failure to properly maintain the racetrack by watering the racetrack prior to training horses; (2) failure to provide a dirt pathway (instead of asphalt) from the stable area to the racetrack; (3) the failure to allow the paddock gate entrance to be opened and used during training hours; and (4) the failure to enclose the stable area with chain link fencing. The jury returned a verdict for the plaintiff, and Timonium appeals.

On appeal, Timonium advances four contentions. *First*, it argues that none of the alleged defective conditions were latent perils; rather, it claims that the conditions were "open and obvious and fully known to ... decedent, who nevertheless chose to use the premises with full knowledge

---

1. Timonium, in its motion for directed verdict at the close of all the evidence, also contended that there was no evidence that the failure to provide an outrider or ambulance during training hours showed negligence on its part, as it was contended by Mrs. Lee. The trial judge, in effect, granted this part of the motion for directed verdict by instructing the jury that the alleged absence of an outrider or ambulance "in no way contributed to the happening of the accident or injury."

of those conditions." Timonium asserts that under these circumstances Aimee, as a matter of law, had assumed the risks and the landowner violated no duty owed to her. *Second,* it is contended that there was no proof that the conditions complained of were the proximate cause of the accident, and that therefore there should have been a verdict directed against the plaintiff. *Third,* Timonium asserts that the trial court erroneously instructed the jury that the "defense of assumption of risk failed if the jury found that the rider of the runaway horse acted reasonably in the face of an emergency situation." *Fourth,* Timonium argues that Mrs. Lee was improperly allowed to express certain "expert" opinions at trial.

## (1)

A landowner owes a duty to invitees to keep his premises in a reasonably safe condition and to protect them against dangers of which he knows, or which with reasonable care he should have discovered. *Lloyd v. Bowles,* 260 Md. 568, 572, 273 A. 2d 193 (1971); *Mondawmin Corporation v. Kres,* 258 Md. 307, 315, 226 A. 2d 8 (1970); *Yaniger v. Calvert Bldg. & Con. Co.,* 183 Md. 285, 288, 37 A. 2d 263 (1944); *Maryland Sales & Serv. Corp. v. Howell,* 19 Md. App. 352, 357, 311 A. 2d 432 (1973). However, the landowner is not an insurer of the safety of his business invitees. *Lloyd v. Bowles, supra,* 260 Md. at 572. Thus, the general rule is that where an invitee knows of a dangerous condition and appreciates the risks involved, yet nevertheless voluntarily chooses to negotiate it, he will be barred from recovering for the risk he chose to assume. *Lloyd v. Bowles, supra,* 260 Md. at 572; *Finzel v. Mazzarella,* 248 Md. 227, 230, 235 A. 2d 726 (1967); *Gibson v. Beaver,* 245 Md. 418, 421, 226 A. 2d 273 (1967); *Evans v. Johns Hopkins Univ.,* 224 Md. 234, 238-239, 167 A. 2d 591 (1961).

Timonium's principal contention is that the instant case falls within this general rule because Aimee both knew of and appreciated the allegedly dangerous conditions, and voluntarily assumed the risks. Thus, Timonium argues that its motion for directed verdict should have been granted

because it breached no duty owed to her, or because she was barred by the defense of assumption of risk.[2]

In reviewing the denial of Timonium's motion for directed verdict, the evidence and all reasonable inferences therefrom must be considered in the light most favorable to the plaintiff. *Moran v. Faberge*, 273 Md. 538, 540, 332 A. 2d 11 (1975); *Jacobson v. Julian*, 246 Md. 549, 555-556, 229 A. 2d 108 (1967); *Greyhound Lines, Inc. v. Alderson*, 26 Md. App. 277, 283, 336 A. 2d 811, *cert. denied*, 275 Md. 749 (1975); *Tippett v. Quade*, 19 Md. App. 49, 56, 309 A. 2d 481 (1973).

The record reveals that Aimee did have *knowledge* of three of the allegedly negligent conditions: (1) the existence of the asphalt pathway (instead of a dirt pathway); (2) the closure of the paddock gate; and (3) the three and one-half foot stone wall bordering the stable area. Mrs. Lee testified that Aimee knew of the asphalt pathway and the stone wall, and that she and Aimee had complained, at least to each other, about the asphalt pavement. When asked whether Aimee knew of the paddock gate being closed, Mrs. Lee answered, "You can see that it was closed." However, while Mrs. Lee said she herself had complained about the paddock gate and the stone wall, she testified that Aimee had not done so.

While Mrs. Lee's testimony shows that Aimee had prior knowledge of the above-mentioned three conditions, the evidence does not disclose Aimee's knowledge of the sandy conditions caused by Timonium's alleged failure to properly

---

**2.** Timonium, in its brief, at times seems to view the alleged obviousness of the dangers as relieving it from liability on the ground that it breached no duty owed to Aimee. At other times Timonium appears to suggest that the obviousness of the danger gives rise to the affirmative defense of assumption of the risk. This reflects no confusion on Timonium's part as to the rationale for denying recovery based on a plaintiff's encountering a known risk, but rather is a source of debate and discussion in the law of torts generally. As to whether the obviousness of a hazardous condition goes toward the landowner's duty, or creates an affirmative defense, *compare* 2 Harper and James, *Torts* § 21.1 (1956); James, *Assumption of Risk*, 61 Yale L. J. 141 (1952); Bohlen, *Voluntary Assumption of Risk*, 20 Harv. L. Rev. 14, 18 (1906); *with* Keeton, *Personal Injuries Resulting From Open and Obvious Conditions*, 100 U. Pa. L. Rev. 629, 633 (1952); Prosser, *Torts* § 68 (4th ed. 1971). Also, with respect to Maryland law, *compare* Bull Steamship Lines v. Fisher, 196 Md. 519, 525, 77 A. 2d 142 (1950) *with* Maryland Sales & Serv. Corp. v. Howell, *supra*, 19 Md. App. at 358.

water the track. Although the testimony showed that Aimee knew the track was dry and sandy on the day before the accident, the condition was not a permanent one, and Aimee could reasonably have expected it to be remedied by the next morning. In fact, a track official testified that the race course was watered "as it needs watering." The previous day's dry conditions, then, could have reaffirmed her expectations that the track would be appropriately watered the next day. According to Mrs. Lee, on the day of the accident Aimee did not realize that the course was dry and sandy until the horse became unruly at the gust of wind-blown sand. Thus, despite her attempt to reenter the track, the transaction had arguably begun, and a jury could reasonably find that she had no prior knowledge of the alleged dangerous condition created by the dry track surface.

As to the three conditions of which Aimee had knowledge, arguably a jury question was presented as to whether she appreciated the risks involved. Although Aimee had been riding for over eight years, and "complained" about one of the conditions, the conclusion is not inescapable that she appreciated the risks involved. In *McKenzie v. Egge*, 207 Md. 1, 113 A. 2d 95 (1955), a tenant continued to use her rear porch despite previous notice to the landlord that it was defective, and the landlord argued that the tenant was either contributorily negligent or had assumed the risks of personal injury sustained when the railing collapsed. The Court of Appeals held that the issues were for the jury's consideration, noting that "it does not follow that because she knew of the defective condition and complained of it, she was necessarily aware of the full extent of the risk." 207 Md. at 10, 113 A. 2d at 99.

An objective test is to be applied in determining whether an invitee realizes the risks, *Glaze v. Benson*, 205 Md. 26, 33, 106 A. 2d 124 (1954). As stated in Prosser, *Torts* § 55, 303 (2d ed. 1955), and *quoted with approval* in *Gibson v. Beaver*, *supra*, 245 Md. at 421, "where it is clear that any person of normal intelligence in his position must have understood the danger, the issue must be decided by the Court." In the

present case, however, the record does not show that the dangers posed by negligent conditions such as those alleged would be necessarily comprehended by "any person of normal intelligence in . . . [Aimee's] position." Absent proof of sufficient expertise, an invitee at the Timonium racetrack like Aimee cannot be said to have fully appreciated certain dangers merely because he or she was aware of them. The trial court below, in rejecting defendant's motion for a directed verdict, concluded that "it is a matter for the jury's determination as to the risk of injury, *whether or not it was evident to the Plaintiff . . . .*" (Emphasis supplied.) In light of the directed verdict standard to be applied here, a jury issue was presented as to whether Aimee had both knowledge and appreciation of the negligent conditions.

Moreover, there is an additional reason why the issue of assumption of risk was properly submitted to the jury in this case. The trial judge instructed the jury

> "that the defendant cannot rely on contributory negligence or assumption of risk as a defense if the negligence of the defendant interfered with a right or privilege of Aimee Britton to use the race track facilities, unless the conduct of Aimee Britton was unreasonable under the circumstances. In any event, if the conduct and behavior of Aimee Britton was not unreasonable under the circumstances, she is not guilty of any contributory negligence or assumption of the risk which would preclude a recovery in this case."

The issuance of this instruction was not objected to below. However, even if the instruction had been objected to, we believe that it embodies a correct statement of Maryland law in light of the facts of this case. Even if Aimee knew of and appreciated the risks inherent in the allegedly negligent conditions, the jury was entitled to find that she acted reasonably under the circumstances and therefore was entitled to recover.

In certain situations, an invitee will not be barred from recovery, despite his comprehension of the dangerous

conditions presented, unless he acted unreasonably under the circumstances. As expressed in Restatement of Torts (2d) § 343A (1) (1965) (emphasis supplied):

> "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*"

Comment (f) to that section provides (emphasis supplied):

> "There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.
>
> "Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, . . . where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk. *In such cases the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with* contributory negligence, or *assumption of risk. . . . It is not, however, conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances.*"

While the Maryland appellate courts have not expressly dealt with § 343 (1) of the Restatement 2d, the Court of

Appeals has expressly endorsed a somewhat similar section, Restatement of Torts (2d) § 473 (1965), which provides with respect to contributory negligence:

> "If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in doing so unless he acts unreasonably."

*Ensor v. Ortman*, 243 Md. 81, 89, 220 A. 2d 82 (1966); *McKenzie v. Egge, supra*, 207 Md. at 11.

Although, by its terms, § 473 does not deal with the doctrine of assumption of risk, it appears that some cases have adopted the section in that context. In *Sacks v. Pleasant*, 253 Md. 40, 251 A. 2d 858 (1969), a tenant sought recovery from the landlord for damages sustained when she fell from a defective toilet seat in her apartment. The landlord contended that the plaintiff had either assumed the risk or was contributorily negligent because she was aware that the toilet seat was loose. The Court noted that it did not regard the tenant's use of the toilet seat as an "exposure to a known or obvious danger," since, although she knew the seat to be loose, it had never come off before and she was surprised when it did. After approving the Restatement rule expressed in § 473 the Court stated (*id.* at 48, emphasis supplied):

> ". . . Mrs. Pleasant was not, as a matter of law, contributorily negligent, nor did she, as a matter of law, *assume the risk*. Whether she acted reasonably or unreasonably under the circumstances was a question properly submitted for determination by the jury."

*See also McKenzie v. Egge, supra*, 207 Md. at 10-12.

In *Finzel v. Mazzarella, supra*, 248 Md. at 230, the Court said that "a possessor of land is *usually* under no obligation to protect an invitee against dangers which are known to the invitee." (Emphasis supplied.) In support, the opinion cited Prosser, *Torts* § 61, at 403 (3d ed. 1964), where it is stated:

"[I]n the usual case, there is no obligation to protect the invitee against dangers which are known to him, or which are so obvious and apparent to him that he may reasonably be expected to discover them. . . . But this is certainly not a fixed rule, and all of the circumstances must be taken into account. In any case where the occupier, as a reasonable man, should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required. This is true . . . where the condition is one such as icy steps, which cannot be negotiated with reasonable safety even though the invitee is fully aware of it, and, because the premises are held open to him for his use, it is to be expected that he will nevertheless proceed to encounter it. In all such cases the jury may be permitted to find that obviousness, warning or even knowledge is not enough."

In the instant case, assuming arguendo that Aimee had knowledge and appreciation of the risks, the evidence was sufficient for the jury to conclude that she was acting reasonably under the circumstances. While Aimee's use of the track may have been "voluntary" in one sense, it cannot be said Timonium was the "choice" of Ridgely Lee or Aimee. In the first place, while trainers could indicate preferences for assignment to track facilities, they could not "choose" a particular track. Instead, the location of their training site was determined by the Racing Secretary at Pimlico. Consequently, Mrs. Lee's and Aimee's first preference, the allegedly safer Pimlico Race Track, was denied them. Instead they were assigned to their second preference, Timonium Race Track.

Moreover, at the time the assignment to Timonium was made there was evidence that it would have been too late to go to the other training sites at Bowie or Laurel. Mrs. Lee testified that "[I]f you refuse to go where you are assigned,

then you just may appeal and request another place, but more than likely, the other places have been assigned. You are told if you don't want the stalls allotted to you, then you have nowhere to go." Also, while Aimee and Mrs. Lee may have "picked" the Timonium racetrack as a first alternate, this was not a true "choice" on their part, but rather the expression of a preference, since ultimately the Racing Secretary had the power of assignment. Along with this must be considered the relatively slight chance of injury Aimee apparently exposed herself to. The record shows that Timonium went for "years and years" without a similar accident.

In conclusion, we believe that the evidence viewed in the light most favorable to the plaintiff was sufficient in this case for a jury issue to be presented as to whether Aimee, under the circumstances, acted reasonably in choosing to negotiate the risks, even if she was aware of them, rather than forego use of the racetrack entirely.

(2)

Timonium also contends that its motion for a directed verdict should have been granted because "[t]here was a total absence of proof that any of the conditions complained of were a proximate cause of the accident." As noted by the Court of Appeals in *Jubb v. Ford*, 221 Md. 507, 513, 157 A. 2d 422 (1960), whether proximate cause "exists is to be decided in a common-sense fashion in the light of the attending facts and circumstances, and, unless the facts are undisputed and admit of but one inference, the question is for the jury."

In the present case, we think that the evidence, viewed in the light most favorable to plaintiffs, justified submission of the question of proximate cause to the jury. Mrs. Lee, who was properly qualified to testify as an expert witness (as hereinafter discussed), provided evidence to establish that each of the negligent conditions contributed to the accident. For example, she testified that the paddock gate was a safer entrance to the track than the gate which Aimee was required to use on the day of the accident. Because of the

paddock gate's narrower width and physical construction, as compared with the entrance Aimee was forced to use, it would have been more difficult for a horse to turn around. Thus, if the horse were frightened, the horse would "more than likely go straight forward to the race track." The gate which Aimee used, however, was constructed so as to permit the horse to turn around and escape toward the wall at York Road. As to the failure to provide a dirt pathway instead of an asphalt path, Mrs. Lee testified that asphalt provides a "slippery" surface, and that a horse needs a sand or dirt surface so that it "can get some grab with his feet." There was evidence that the horse was not fully out of control until it left the gate, at which point it slipped on the asphalt and "panicked."

The evidence was also sufficient to show that the failure to water the track, resulting in the dry track condition, may have been a proximate cause of the accident. Mrs. Lee testified that the wind was blowing steadily at 30-40 miles per hour, and that a gust of wind blew sand and dirt towards Aimee's horse, "cutting it in the eyes," and causing it to become "fractious." Although Mrs. Lee did not actually see the sand hit Aimee's horse, the sand also hit her, despite the fact that she was standing in a more sheltered spot. If the track had been properly watered, Mrs. Lee said, the sand and dirt would have been prevented from blowing.

Finally, a jury question was presented as to whether the failure to construct a tall chain link fence, rather than a three and one-half foot stone wall, was a proximate cause of the injury.[3] According to Mrs. Lee:

> "If there had been an eight to ten foot high fence when the horse ran towards that fence, it would not have tried to jump it. The horse would have more than likely had reared away from the fence and

---

[3]. We note that counsel for Timonium conceded at oral argument that the racetrack was negligent in failing to maintain a chain link fence, and that this dangerous condition has since been rectified. No concession was made, however, as to whether the absence of a tall fence was a proximate cause of the injury.

gone in another direction. Even if it had gone straight into the fence, it would have stopped the horse and ... there would not have been the possibility of my child going off when the horse jumped."

(3)

Timonium also argues that the trial court erroneously instructed the jury that the defense of assumption of risk is not available if the jury found that Aimee Britton acted reasonably in the face of an emergency situation. The trial judge told the jury:

"You are further instructed when an individual is confronted by an emergency situation, the conduct of the person involved in the emergency is to be judged with respect to a standard of care by considering how a reasonable person would react under similar circumstances, and an error of judgment, if reasonable under the circumstances, is not contributory negligence or assumption of the risk."

Timonium contends that the emergency doctrine is available only as a shield against the defense of contributory negligence; it has no application, Timonium asserts, to the defense of assumption of risk. Timonium also seems to argue that there was no factual basis for the instruction in this case.

We believe that the emergency doctrine does have application to the assumption of risk defense and that the instruction was properly given under the facts of this case.

The decision of the Court of Appeals in *Scott v. Hampshire, Inc.*, 246 Md. 171, 227 A. 2d 751 (1967), illustrates the applicability of the emergency doctrine to the assumption of risk defense. In that case, a workman was injured while trying to avert injury to other workmen. While working on a roof, he noticed that a steel crane was being operated unsafely, and came down to warn nearby workmen

of the dangerous situation. As he was approaching the other workmen, the overloaded crane dropped its load of steel and injured the plaintiff. The defendant contended that the plaintiff had either assumed the risk or was contributorily negligent. The Court noted that the two defenses were similar and that, in the case before it, the distinction was without importance. The Court then stated (246 Md. at 175):

> "[N]either defense is applicable in this case where the conduct of the defendant appears to have created such a situation as to justify, if not compel the plaintiff to undergo the risk of being injured in order to warn others and avert their harm."

If the doctrine of assumption of risk is inapplicable where the plaintiff tries to avert harm caused to others by defendant's negligence, then *a fortiori* it has no application where the plaintiff, confronted with an emergency created by the defendant, attempts to save himself, unless under the circumstances he acts unreasonably.

Furthermore, we do not believe that the trial judge erred in giving the instruction under the facts of this case. The jury was instructed generally as to the defense of assumption of risk. That instruction was not limited, as Timonium apparently argues, to the situation presented when Aimee initially chose to use the Timonium training facilities, or when she first mounted the horse in preparation for exercising it on the day of the accident. The instruction also encompassed any subsequent risks which Aimee encountered after she initially mounted the horse and attempted to enter the racetrack. There were at least two such emergency conditions with which Aimee was subsequently confronted where the judge might have found that she assumed risks. First, there was testimony that after Aimee's horse became unruly by the wind-blown sand, she again attempted to enter the track, rather than dismount or return to the stables. Under these facts, it is arguable whether she had assumed the risk of further loss of control of the horse. Additionally, there was evidence that Aimee either fell or jumped from the horse. As a result,

there may have been a question in the jurors' minds as to whether Aimee voluntarily assumed the risks created by jumping from the horse.

Thus, when Aimee first decided to ride the horse no emergency was presented, and the emergency doctrine was inapplicable to that situation. Subsequently, when Aimee acted in an emergency caused by Timonium's alleged negligence, her conduct would not amount to an assumption of the risks unless her actions were unreasonable.

### (4)

Timonium's last contention is that the trial court improperly allowed Mrs. Lee to express certain opinions as an expert witness. These opinions included the following:

1. The track was too dry and needed sprinkling.
2. There should have been a dirt path across the road.
3. Instead of a three and one-half foot fence, there should have been a ten foot fence.
4. The paddock gate should have been opened.
5. The accident could have been avoided had there been a ten foot fence even if the horse had run into it and caused her daughter to fall.
6. The accident could have been avoided if the track had been sprinkled.

We find no merit to this contention. A trial court has wide discretion to determine the qualifications of a witness as an expert. *Nizer v. Phelps*, 252 Md. 185, 249 A. 2d 112 (1969); *Brinsfield v. Baltimore City*, 236 Md. 66, 72, 202 A. 2d 335 (1964). Mrs. Lee testified that for twelve years she had been breeding, boarding and training race horses, and that she was familiar with the tracks in Maryland and surrounding states. The trial judge, after reviewing her qualifications, determined that she had sufficient "expertise in the preparation of tracks for a meet and for the purpose of exercising, etc. I think she can testify to that."

A similar situation was presented in *Scott v. Hampshire, Inc.*, *supra*. In that case the plaintiff claimed that defendant negligently used a chain to lengthen a steel cable on a crane. The court allowed the plaintiff to give his opinion that it was safer to use a cable rather than a chain in the operation of a crane, stating (246 Md. at 176):

> "With further reference to the testimony of the plaintiff, who, over objection, was allowed to give his opinion that it was safer to use a cable rather than a chain as a choker, we see no reason for precluding him from stating that a chain should not have been used in unloading steel from a truck with a crane. As a seabee in the Navy, the witness had not only learned that the unloading of steel with a chain instead of a cable as a choker was unsafe, but also had operated a crane in the building of naval installations and aviation facilities. It is probable therefore that the plaintiff could be considered qualified to testify as an expert witness. As a general rule, a witness who in studying or by experience has acquired knowledge of a particular subject or activity — not within the ken of an ordinary person — is considered to be an expert and as such is qualified to give an opinion as to the matter of his expertise."

In light of Mrs. Lee's experience we believe that she was similarly qualified to give an expert opinion.

*Judgment affirmed.*
*Appellant to pay costs.*