# GEORGE M. KLINE ET AL. *v.* THE CHASE MANHATTAN BANK, N.A.

[No. 1337, September Term, 1978.]

*Decided July 12, 1979.*

134

The cause was argued before GILBERT, C. J., and MORTON, J., and Samuel W. BARRICK, Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Burton A. Schwalb,* with whom were *James K. Stewart, Kevin J. McCarthy* and *Schwalb, Donnenfeld & Bray* and O'Malley, Miles, Farrington & McCarthy on the brief, for appellants.

*Louis B. Thalheimer,* with whom were *Thomas L. Crowe* and *Cable, McDaniel, Bowie & Bond* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Trial judges, as a rule, are cast in appellate briefs in one of two roles, *viz.* they are either somewhat short of astute or, at least for the purpose of the particular appeal, a combination of Coke, Blackstone, Marshall, Holmes, Brandeis and Cardozo. This appeal is no exception. The appellants [1] view the trial judge as having committed error piled upon error while the appellee,[2] true to form, extols his wisdom.

At the root of this appeal lies the issue of whether the appellants should be held personally liable for the payment

1. Appellants Kline and Kintner were general partners in the Palmer Park Ltd. Partnership. Kintner held his general partnership interest for himself and as nominee for eleven other limited partners.
2. Chase Manhattan Bank.

of the full amount of a deed of trust note executed between a limited partnership and the appellee. The appellants signed and delivered to the appellee's assignor [3] an "unconditional guaranty[4] of due performance and prompt payment ... of all the Borrower's obligations under the Note, the Mortgage and the Building Loan Agreement ... including all legal and other costs or expenses paid or incurred...." We think that the appellants are personally liable to the appellee, and we affirm the judgment of the Circuit Court for Prince George's County (Loveless, J.). We shall now explain why.

## THE FACTS.

In the fall of 1964, Mr. E. J. Dunningham, a Chase vice-president and lending officer, met with Mr. Richard Duckett, a Washington D.C. mortgage broker. At that time Chase was seeking borrowers for commercial real estate construction and permanent loans, and Duckett was in a position to locate prospective borrowers. Duckett spoke with Appellant Kline, a developer of commercial residential real estate. Coincidentally, Kline had a contract to purchase 22.8 acres of land in Prince George's County upon which he intended to erect apartment houses. Kline showed to Duckett the preliminary plans for over 400 units. Duckett presented the plans to Dunningham.[5]

At trial of this matter, Duckett testified on direct examination that Chase had agreed to the loan upon the following terms:

(a) Chase would have an appraiser estimate the value of the prospective project;

(b) Chase would lend 2/3 of the estimated value of the completed project, with the borrower liable for completing the project but with no personal liability

---

**3.** Conel Television Productions, Inc.

**4.** "Guaranty, *v.* To undertake collaterally to answer for the payment of another's debt or the performance of another's duty, liability, or obligation; to assume the responsibility of a guarantor; to warrant." *Black's Law Dictionary* 833 (4th ed. Rev. 1968).

**5.** Duckett continued to act as "go-between" throughout the transaction.

for the permanent loan once the project was completed, the 2/3 figure being the "normal" or "floor" loan;

(c) Chase would lend up to 3/4 the estimated value, the difference between the 2/3 loan and the 3/4 loan being the "gap," provided that there was personal liability for the "gap" until the permanent loan was paid down to the 2/3 level or a specific rent roll was achieved; alternatively, Chase would make a 3/4 loan without personal liability for the "gap" if the gap (*i.e.,* at the tail end of the construction period) were held back, namely not advanced, until a rent roll achievement was met, or both;

(d) Chase would make a loan only through a New York intermediary corporation rather than directly to the borrower; the form would be that Chase would make the loan to the intermediary, who would, in turn, make the same loan to the ultimate borrower, and the loan arrangement between the intermediary corporation and the ultimate borrower would be assigned to Chase as collateral for the loan by Chase to that New York corporation.

Section I of the planned project was appraised at $2,770,000. Duckett, in the loan application pertaining to Section I, requested $1,830,000, a figure roughly two-thirds of the actual value of the project. Kline, however, was in need of an additional $200,000 for the purchase of the land. Unable to find equity investors for that sum, Kline set out to obtain the needed funds by applying for a 75% commitment, bringing the total loan to $2,050,000. In order to accomplish that end, according to Duckett, Kline would have to have "sufficiently strong guarantors ... so long as those guarantors took the bank off the hook for the difference between a normal loan [66⅔%] and ... an increased loan, 75 per cent."

Kline, in May 1965, asked certain partners at the law firm of Arent, Fox, Kintner, Plotkin, and Kahn if they would invest in the project, become partners in the venture, and assume liability for the "gap" of $225,000. Eleven members of the

firm agreed to do so, ten as limited partners, with Kintner as their nominee and as a general partner. Meanwhile, Duckett had purchased Conel Television Production, Inc. (Conel), a dormant New York corporation, that was to act as intermediary in setting up the loan and assigning the collateral to Chase.

On October 26, 1965, the closing was held relative to Section I. Conel entered into a building loan agreement with the partnership for a $2,050,000 loan to finance construction. At the same time, Chase entered into a loan arrangement with Conel for the exact same amount. The Chase-Conel loan was secured by Conel's interim pledge to Chase of its interest as construction mortgagee in the project.

At closing, the partnership delivered to Conel a document signed by all the partners, general and limited, and their wives. The pertinent parts of that document, the virtual eye of the storm now raging before us, provide:

> "RE:  Construction Mortgage Loan of $2,050,000 to Palmer Park Limited Partnership evidenced by Note and Mortgage or Deed of Trust (the Mortgage) dated September ___, 1965

> To induce you to consummate the captioned transaction and to lend the indicated amount to the above named Borrower, to be advanced in accordance with a Building Loan Agreement made between you and the Borrower, we hereby jointly and severally represent, warrant and covenant as follows:

> 1. The Building Loan Agreement, Mortgage and Note were duly executed by the Borrower and are legal, valid and binding instruments, enforceable against the Borrower in accordance with their respective terms.

> 2. *Each of us unconditionally guarantees to you and to any purchaser of the Note from you, the due performance and prompt payment, whether at maturity or by acceleration or otherwise, of all of*

*Borrower's obligations under the Note,* the Mortgage and the Building Loan Agreement, together with interest on such obligation to the extent provided for in said documents, *including all legal and other costs or expenses paid or incurred by you in the enforcement thereof against either the Borrower or any of us.*

3. Our liability hereunder shall be unaffected by any amendment or modification of the provisions of the Note or any other instrument made to or with you by the Borrower, whether made with or without notice to us, and we hereby covenant that we will cause the Borrower to maintain and preserve the enforceability of the instruments aforesaid as the same may be modified and to take no action of any kind which might be the basis for a claim that we have any defense to our obligations hereunder other than payment in full of the Note in accordance with its terms. Each of us hereby agrees to indemnify you against loss, cost or expense by reason of the assertion by the Borrower of any defense to its obligation under any of the instruments or the assertion by any of us of a defense to our obligation hereunder based upon any such action or inaction of the Borrower. Each of us waives any right or claim of right to cause a marshalling of the Borrower's assets or to cause you to proceed against any of the security for the Note before proceeding against us or to proceed against us in any particular order and each of us agrees that any payments required to be made by us hereunder shall become due on demand in accordance with the terms hereof and of the Note immediately upon the happening of any default under the Note and without presentment of the Note to the Borrower, demand for payment or protest thereof, or notice of nonpayment or protest thereof and each of us expressly waives and relinquishes all rights and remedies accorded by applicable law to guarantors.

. . . .

> 6. This guaranty shall be construed and enforced in accordance with the laws of the State of New York." (Emphasis supplied.)

The guaranty of payment was one of the documents assigned as collateral to Chase by Conel in 1965.

Subsequently, in February 1966, Chase and the appellants entered into a loan agreement for Section II. The same guarantors executed a guaranty of payment for that loan, but, in contrast to the Section I document, it contained explicit provisions stating that the guarantor's liability to Chase for Section II would terminate upon the completion and rent up of that section.

By July 1967, construction of Section I was completed and was substantially rented. Chase then purchased the note and allied documents for Section I from Conel.

As a result of the partnership's default on both loans, Chase foreclosed on the mortgages. A substantial deficiency occurred. Obviously seeking to avert personal liability, the appellants herein filed an action against Chase in the Circuit Court for Prince George's County, in Equity, seeking reformation of the above-quoted guaranty of payment. The objective of the reformation suit was to limit the liability of the guarantors for Section I, in a like manner as the guaranty for Section II. Chase counterclaimed under the guaranty for payment of the deficiency resulting from the foreclosure. Following a hearing in August 1976, Judge Ernest A. Loveless denied the appellants' reformation and transferred Chase's counterclaim to the law side of the court. "Finality" of the reformation decision, for purposes of appeal, was withheld until resolution of the counterclaim. Md. Rule 605.

The counterclaim was tried non-jury, before Judge Loveless. The judge ruled that Chase was entitled to payment in accordance with the terms of the guaranty, entered judgment for Chase and ratified its 1976 decree denying reformation of the guaranty instrument.

Desiring to escape from the net of financial entanglement in which they find themselves enmeshed, the appellants have

brought their cause to this Court. They posit to us a series of questions as to whether the trial court erred in:

1) holding the appellants personally liable in the light of the evidence;

2) finding personal liability on the face of the closing documents which demonstrate that such liability was never intended;

3) holding the partners ratified the guaranty;

4) deciding that Chase sustained damages even though it actually suffered none and the deficiency judgment was founded in fraud;

5) awarding counsel fees on the basis of inadmissible hearsay, coupled with the lack of evidence as to reasonableness.

### CLEARLY ERRONEOUS.

The least common denominator of questions 1 and 2 is simply the old "clearly erroneous rule," adorned in more sophisticated language. It is well established that when a case is tried non-jury, this Court will review the matter on both the law and the facts, but the judgment of the trial judge "will not be set aside on the evidence unless clearly erroneous. . . ." Md. Rule 1086. The rule has been cited and discussed so many times that anything more than a reference to it is redundant.

Notwithstanding the wording of the guaranty agreement applicable to Section I, as above-quoted, the court brushed aside Chase's motion for summary judgment and agreed to hear parol evidence concerning, contradicting, and explaining the written agreement. No question has been raised about the use of the parol evidence so that we, for the purpose of this appeal, accept it as properly utilized without expressing either approval or disapproval.

Appellants argue that the parties never intended that the individuals comprising the partnership be held personally liable for payment of the mortgage on Section I. The trial judge found that the wording of the exculpatory clause in the

note [6] provided "an ambiguity as to liability when interpreted in the company of the guarantee agreement." Characterizing the intent of the drafter as "quite elusive," Judge Loveless decided that a genuine dispute of fact existed at that stage of the trial, and that parol evidence would be heard to resolve the ambiguity he perceived.

After testimony, the court concluded "that the Chase Manhattan Bank is entitled to a judgment in this case." The trial judge, in the course of an oral opinion, said, "[E]verything in that statement ... is so clear to the effect that it is a guaranty to pay agreement. It is not just a guaranty agreement for the borrower's liability, but it is a guaranty to pay that entire obligation, that mortgage, that note, which is a deed of trust."

The judge concluded that while, at first glance, there was a conflict between the exculpatory clause in the deed of trust note and the unconditional guaranty signed by appellants, that when the parties were heard and the documents examined, the guaranty of payment was not nullified by the exculpatory clause in the note. The clause in the note held harmless the *maker* of the note, that is, the partnership. The court observed, however, that the guaranty of payment was executed by twenty-four individuals, the partners and their spouses, as guarantors of the "maker," the partnership. In short, the partners and their spouses, jointly and severally, unconditionally guaranteed payment of the maker's liability to Chase.

It is not the function of this Court to weigh conflicting evidence. We decide, merely, "whether there is any evidence

---

**6.** An exculpatory clause in the *note* read as follows:

"Anything in this note to the contrary notwithstanding, it is understood and agreed that the *maker,* or its successors or assigns, or any other person acquiring its estate or interest in the mortgaged property, shall not be personally liable for the payment or repayment of any sums provided for in this note, or for the performance of any of the terms, covenants or agreements herein contained, all of such personal liability being expressly waived and released. In the event of the foreclosure of the aforesaid Deed of Trust, no deficiency judgment shall be asserted or be collectible against the *maker* or its successors or assigns." (Emphasis supplied.)

legally sufficient to support the finding of the trier of facts — in this instance the court sitting without a jury...." *Carling Brewing Co. v. Belzner,* 15 Md. App. 406, 412, 291 A. 2d 175, 179 (1972).

On the record before us, there was competent, material evidence legally sufficient to support the trial court's conclusion. Therefore, the trial court was not clearly erroneous.

## RATIFICATION.

Judge Loveless said:

"[The Partnership] made payments and interest payments. They furnished financial statements. And they knew definitely of ... [the personal liability] in 1970 and took no action.

Mr. Thalheimer [counsel for Chase] argues that this was tantamount to ratification, and I am inclined to agree."

Appellants argue that the trial court was incorrect in that "there was no evidence that the partners ever agreed to be personally liable for the full permanent loan or any deficiency judgment.... There is ... no evidence of ratification." We have an entirely different view.

The evidence presented at trial supports the findings of Judge Loveless that the partnership made payments of principal and interest. The judge's reference to the appellants' personal liability arose from a memorandum in which Earl Colson, an attorney and one of the appellants, opined on April 15, 1970 to Harry Plotkin, another of the appellants, that "it appears that: 1. We are personally liable on the permanent financing for Section One ($2,050,000)."

Furthermore, there was evidence that the appellants obtained several deferrals of principal amortization payments from Chase after Colson's 1970 memorandum, and more than six years elapsed between the determination by Colson that the appellants were personally liable on the note and the filing of the reformation suit. That evidence, in our view, was

legally sufficient to support the trial court's conclusion that the appellants had ratified or acquiesced in the loan complete with their personal liability for payment. *See Hoffman v. Seth,* 207 Md. 234, 239, 114 A. 2d 58 (1955); *Hagan v. Dundore,* 187 Md. 430, 441, 50 A. 2d 570 (1946).

## FRAUD IN THE FORECLOSURE.

Chase instituted foreclosure proceedings against the partnership in 1976. The sale of the property was held in 1977, but the proceeds were inadequate to pay the Section I mortgage debt in full. The chancellor entered a Final Decree of Ratification of the foreclosure sale in July 1977. That decree was sustained on appeal to this Court in *Palmer Park Limited Partnership v. Thalheimer,* an unreported per curiam opinion No. 914, September Term, 1977 (filed April 10, 1978).

At the trial of the instant case, Judge Loveless ruled that the deficiency judgment, if there would be one, would be guided by "the value as set forth in the account once the sale had been ratified and confirmed." Appellants here argue that that ruling was in error because of "the factual scenario of fraud" perpetrated by Chase during the foreclosure proceedings. Appellants are, in effect, attempting to challenge the validity of the foreclosure decree, notwithstanding its ratification by the trial court and this Court's subsequent affirmance on appeal.

Absent fraud, mistake, or irregularity in the foreclosure sale, the ratification by the court wraps the proceeding in the armor of *res judicata* so that the foreclosure may not be collaterally attacked for inadequacy of the price obtained at sale. *McKenna v. Sachse,* 225 Md. 595, 171 A. 2d 732 (1961); *Walton v. Washington County Hospital Association,* 178 Md. 446, 451, 13 A. 2d 627 (1940). Moreover, the right of the mortgagee to a deficiency decree against the mortgagor is not affected by the mortgagee's buying of the property at the foreclosure sale, *McKenna v. Sachse, supra; Pennsylvania Avenue Federal Savings & Loan Association v. Fedder,* 175 Md. 127, 134, 199 A. 785 (1938), nor is the mortgagee-purchaser accountable to the mortgagor for

profit, if any, made from a resale. *Walton v. Washington County Hospital Association, supra; Pennsylvania Avenue Federal Savings & Loan Association v. Fedder, supra.*

Ignoring the clear rule that a ratified foreclosure proceeding may not be collaterally assailed, the appellants sought to inject into the suit on the guaranty the revenant of fraud allegedly committed by Chase in the foreclosure. Appellants here aver that Chase had already obtained a purchaser for the property, at a price well in excess of that it paid at the foreclosure. The expert witness who testified for Chase in the foreclosure ratification proceeding valued the property at approximately $2,300,000. He had admittedly not been informed that Chase had a purchaser for the two sections at a price of $3,550,000. Because of Chase's nondisclosure of the negotiations relative to a resale, appellants perceive that a fraud has been perpetrated upon them and the court.

A serious question arises as to whether the issue of fraud, as such, was ever squarely placed before the trial judge, but if we assume *arguendo* that it was, then it certainly was not ruled upon by him and is not properly before us. Md. Rule 1085. Nevertheless, we shall briefly address the matter.

To explain their failure to raise the question of fraud during the foreclosure ratification proceeding, the appellants state that they did not know that Chase had negotiated for resale until discovery proceedings were employed in the suit on the guaranty. Even if that be so, the suit on the guaranty is the wrong place, the wrong way, and the wrong time to assert fraud in the foreclosure. The proper method would be to petition the equity court pursuant to Md. Rule 625 a to revise its ratification decree on the ground of fraud. Md. Rule 625 a confers upon trial courts the power to revise its judgments at any time where fraud is asserted and proven, subject, of course, to laches and the rights of innocent third parties.

## *ATTORNEYS' FEES.*

Appellants argue that the award of attorneys' fees to Chase's counsel was based on two sets of invoices which were

inadmissible hearsay, and that no foundation was laid for the admission of the invoices.

Business records are admissible under the exception to the hearsay rule if "made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event," and the "practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards." Md. Courts and Judicial Proceedings Code Annotated (1974) § 10-101 (b) and (c). Before the records can be received into evidence, a foundation must first be established showing that the records were made in the regular and normal course of business. Courts art. § 10-101 (b) and (c) does not require that the foundation consist of testimonial evidence. *Morrow v. State,* 190 Md. 559, 59 A. 2d 325 (1948). "At times a court may properly conclude from the circumstances and the nature of the document involved that the proffered document was made in the regular course of business." *Thomas v. Owens,* 28 Md. App. 442, 448, 346 A. 2d 662, 665 (1975). *See also Pine Street Trading v. Farrell Lines,* 278 Md. 363, 373, 364 A. 2d 1103, 1110 (1976). In *Thomas v. Owens, supra,* we held that invoices from a professional organization were admissible to prove damages without testimony to establish their character as business records. In the case now before us, the professional bills of the appellee's attorneys were clearly records made in the regular course of business. As such, they were properly admitted as evidence of the legal services performed, but not as evidence that the charges contained therein were reasonable. *Thomas v. Owens, supra,* 28 Md. App. at 445. There must be other evidence demonstrating that the charges set forth in the invoice are reasonable. *Ibid.* Ordinarily, the court should receive testimony as to the reasonableness of the charges, but where, as here, the trial judge was thoroughly familiar with the nature of the proceedings from their inception in the foreclosure proceeding through the trial on the guaranty, as well as the quantity and quality of the services performed by appellee's attorneys over an extended period of time, he may rely upon his own knowledge and experience in determining the value of counsel's services.

*Foster v. Foster,* 33 Md. App. 73, 77, 364 A. 2d 65, 68, *cert. denied,* 278 Md. 722 (1976). That is precisely what Judge Loveless did in the case at bar. Based upon his own experience and knowledge of the value of the services of counsel he considered "the overall picture" and reduced the claim for fees from $135,000 to the fee of $75,000 that he ultimately allowed. We observe no error.

*Judgment affirmed.*
*Costs to be paid by appellants.*