517 A.2d 1122

**James Vernon PAHANISH, et ux.**

v.

**WESTERN TRAILS, INC., et al.**

**No. 52, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Dec. 4, 1986.

**344**

**346**

Suzanne X. Conger (Burnett, Eiswert & Janes, P.A., on the brief), Oakland, for appellants.

Horace P. Whitworth, Jr., Westernport, for appellees.

Argued before GARRITY, ALPERT and BLOOM, JJ.

BLOOM, Judge.

It has been said that the horse is the "noblest conquest man has ever made." [1] The horse was placed at its master's side in the tombs of the pharoahs and in the graves of Scythian kings. Since the Stone Age, it has occupied an important place in the realm of art. From Bucephalus to Roan Barbery to the Byerly Turk, the horse has been a symbol of the potency, and power, and passion of man. It

---

**1.** George Louis Leclerc de Buffon (1707–1788), *L'Histoire des Mammifieres, Le Cheval.*

has borne him through his travels, labors and military adventures.

This case, however, concerns a horse (named "Noble") in a somewhat less than noble or heroic moment. On July 25, 1983, appellant, James Vernon Pahanish, was injured while horseback riding with his family in Garrett County, Maryland. In March, 1984, appellant instituted this action against appellee, Western Trails, Inc., in the Circuit Court for Garrett County, alleging, *inter alia*, that appellee, the operator of a horse riding stable, was negligent in failing to provide appellant's family with safe and properly equipped horses, in failing to inspect the saddle and other equipment on appellant's horse, and in neglecting properly to control and secure the horses used in the Pahanish family's trail ride.

The matter was tried before Chief Judge Frederick A. Thayer, III, sitting without a jury, on December 13, 1985. At the close of the evidence offered by appellant, appellee made a motion for judgment pursuant to Rule 2–519. Judge Thayer granted appellee's motion, reasoning that the evidence presented failed to demonstrate appellee knew or should have known of any mischievous propensity on the part of the horses involved in the incident and further failed to indicate that appellee knew or should have known that the equipment on appellant's horse was defective. The trial court further noted there was no evidence showing the equipment was, in fact, defective. Additionally, the court found that although appellee's horse stables were not licensed or inspected in the year in question, as required by statute, the evidence failed to demonstrate a causal connection between the statutory violation and appellant's injury.

Appellant raises the following issues on appeal:

I. Whether the trial court, in ruling on appellee's motion for judgment, failed to consider the evidence presented in the light most favorable to appellant, as required by Md.Rule 2–519.

II. Whether the trial court erred in determining the doctrine of *res ipsa loquitur* was inapplicable.

III. Whether the trial court erroneously concluded that appellee's violation of statutory provisions governing the licensing and inspection of horse stables did not establish a *prima facie* case of negligence on appellee's part.

IV. Whether the trial court erred in concluding appellee was not strictly liable for appellant's injuries in light of the possibility the tack on appellant's horse may have contained a latent defect.

## *Facts*

Members of appellant's family testified that on 25 July 1983, appellant rented five horses from appellee in order that he, his wife, and three children, Melanie, Gregory and Michael, could go trail riding. The children selected their horses; appellee's employees brought appellant and his wife the horses they were to ride. Each of the horses was brought out from the stables already saddled. The horses' stirrups were adjusted for the family riders. Only Melanie and Gregory appear to have been given any riding instructions, principally on the use of the reins to direct and control the horses. Appellee's employees inquired into the prior riding experience of several members of appellant's family, but did not ask appellant about his previous riding experience. All of appellant's children had ridden before, but neither appellant nor his wife had been on a horse in recent years.

A trail guide led the Pahanish family through a field, down onto a rocky, muddy path, then out onto a small road. The testimony of appellant's family members is conflicting as to whether the family was instructed by the trail guide to stay in a line. During this period appellant's daughter became frightened because she thought her horse was going too fast. Appellant, at the request of the trail guide, rode his horse up to where Melanie was riding in an effort

to talk to her and calm her down. This apparently happened a second time. The trail guide then asked whether any of the family wished to run their horses in a nearby field. Gregory and Michael, accompanied by the trail guide, ran their horses for about ten minutes. Appellant and the rest of the family waited, without dismounting, for the boys' return.

Appellant testified that soon after the boys' return the family started out to ride again and that just as they began to ride Gregory's horse started to jump around, tried to kick a couple of the horses, then pulled up next to or in front of appellant's horse and kicked it. Appellant stated that his horse reared and, although he grabbed on to the reins and saddlehorn, he and the saddle were thrown off. He further testified that he noticed the saddle on the ground after he fell, but made no mention of its condition. Other members of appellant's family described the incident in essentially the same manner.

Appellant attempted to get up off the ground several times but was unable to do so because he was experiencing severe pain in his back. His daughter remained with him while the trail guide and the rest of appellant's family went to get a car to transport appellant.

Some time later, appellant heard a female voice holler, "Did you find them, Eugene?" Appellant testified that a young man then approached him, picked up a "part of the saddle" and said, "This is the same thing that happened to my Pap." In response to interrogation by the court on this portion of appellant's testimony, appellant stated that the "part of the saddle" picked up by Eugene was a strap or girth. When asked to describe the strap, appellant remarked it looked like "just a brown belt."

Appellant was placed in a car by a young man and woman and chose to remain there until the boys finished their ride. Appellant's son Gregory continued to ride the same horse which had recently kicked his father's horse. Later appellant was taken to the hospital by his wife. Appellant was

determined to have suffered an acute lumbosacral sprain. He testified regarding his persistent back problems since the accident.

Ms. Beverly Raymond of the Maryland Department of Agriculture testified that in 1983, the year of the incident in question, appellee had failed to obtain a license for his riding stables, in violation of section 2–710 of the Maryland Agriculture Code Annotated. She further testified that the stables had not been inspected in that year, in violation of section 2–713 of the Maryland Agriculture Code Annotated. Her testimony indicated that appellee's stables were licensed and inspected in both 1981 and 1982. The 1981 inspection revealed some uncleanliness in the stable stalls and the inspection report recommended that some reins in the tack room be replaced or oiled. The 1982 inspection report did not reveal any deficiencies with respect to the tack equipment. Appellee was unlicensed at the time of the State's effort to inspect its stables in 1984. Ms. Raymond testified that her 1984 inspection revealed the bedding for the horses was scant and that the equipment hanging in the tack room was adequate, but could have been better. She did not specify the nature of any problem with the tack, or how any of the equipment might have been improved. She testified that appellee was properly licensed in 1985. The State had not yet conducted its 1985 inspection at the time of the trial.

# I

Appellant's first contention is that the trial court, in ruling on appellee's motion for judgment pursuant to Rule 2–519(b), failed to consider the evidence in the light most favorable to appellant. Appellant has, however, seriously misconstrued Rule 2–519(b). The Rule provides:

When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close

of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

■■■ Rule 2–519(b) may be dichotomized. In a *non-jury* trial, when a party has moved for judgment, the court is allowed as trier of fact to determine the facts and render judgment thereon. The trial judge is not compelled to make any evidentiary inferences whatsoever in favor of the party against whom the motion for judgment is made. When the motion for judgment is made "under any other circumstances," *viz,* in a *jury* trial, the trial judge must consider the evidence and inferences arising therefrom in the light most favorable to the non-moving party.

■■■ In the case *sub judice,* the matter was tried by the court. Thus, the trial judge was allowed to evaluate the evidence, *as though he were the jury,* and to draw his own conclusions as to the evidence presented, the inferences arising therefrom, and the credibility of the witnesses testifying.

The decision relied upon by appellant in support of the first contention, *Lumber Terminals, Inc. v. Nowakowski,* 36 Md.App. 82, 373 A.2d 282 (1977), was issued prior to the change in Rule 2–519(b), effective July 1984, allowing the trial judge to proceed as trier of fact after a motion for judgment.

■■■ Rule 1086 mandates that:

When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.

The task before us, therefore, is to review the evidence presented below to determine whether the trial judge's findings were clearly erroneous. *In re Trevor A.,* 55 Md.

App. 491, 501, 462 A.2d 1245, *cert. granted,* 297 Md. 419 (1983), *cert. dismissed,* 299 Md. 428, 474 A.2d 207 (1984); *Schackow v. Medical-Legal Consulting Service, Inc.,* 46 Md.App. 179, 189, 416 A.2d 1303 (1980), *cert. granted,* 288 Md. 741 (1980); *Cosden v. Mercantile-Safe Deposit & Trust Co.,* 41 Md.App. 519, 531, 398 A.2d 460 *cert. denied,* 285 Md. 728 (1979), *cert. denied,* 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 308 (1979); *Szewczyk v. State,* 7 Md.App. 597, 602, 256 A.2d 713 (1969); *Grice v. State,* 2 Md.App. 482, 486, 235 A.2d 316 (1967). The function of this Court in reviewing a non-jury case is not to determine whether, on the evidence, it might have reached a different conclusion. Rather, it is to decide only whether there is any evidence legally sufficient to support the findings of the trier of fact and, in making this decision, it assumes the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom tending to support the factual conclusion of the trial court. *Carling Brewing Co. v. Belzner,* 15 Md.App. 406, 412, 291 A.2d 175 (1972). *See also Eastern Environmental Endeavor, Inc. v. Industrial Park Authority,* 45 Md.App. 512, 519, 413 A.2d 1355 (1980); *Kline v. The Chase Manhattan Bank,* 43 Md.App. 133, 140, 403 A.2d 395, *cert. denied,* 286 Md. 749 (1979).

■ For appellant to succeed in his action for negligence, he would have had to demonstrate that (1) the appellee owed him a duty; (2) appellee breached said duty; and (3) the breach by appellee was the actual and proximate cause of a demonstrable injury sustained by appellant. *Myers v. Montgomery Ward & Co., Inc.,* 253 Md. 282, 291, 252 A.2d 855 (1969); *Jackson v. Pennsylvania R.R. Co.,* 176 Md. 1, 5, 3 A.2d 719 (1939).

■ Testimony offered below establishes that appellant and his family were business invitees of appellee. An invitee is one who is permitted or invited to enter or remain on another's property for purposes connected with the owner's business. *Ralph Pritts & Sons, Inc. v. Butler,* 43 Md.App. 192, 196, 403 A.2d 830 (1979). Appellant entered

on appellee's premises and rented horses from appellee's business for his family's use. At common law, the landowner's duty to business invitees is to use reasonable and ordinary care to keep his premises in a safe condition and to protect invitees against the dangers of which the landowner is aware or which, with reasonable care, he could have discovered. *Lloyd v. Bowles*, 260 Md. 568, 572, 273 A.2d 193 (1971); *Keene v. Arlan's Department Store of Baltimore, Inc.*, 35 Md.App. 250, 255, 370 A.2d 124 (1977); *Ralph Pritts & Sons, supra*, 43 Md.App. at 196, 403 A.2d 830; *Maryland State Fair & Agricultural Society v. Lee*, 29 Md.App. 374, 378, 348 A.2d 44 (1975). A landowner is not, however, an insurer of the safety of his business invitees. *Maryland State Fair, supra*, 29 Md.App. at 378, 348 A.2d 44.

▪ In the case *sub judice*, there was no direct evidence to demonstrate that appellee was aware or should have been aware that the horses involved in the incident presented a danger to appellant's family. Nor was there any evidence which would demonstrate that appellee knew or should have known the equipment on appellant's horse was defective. The only direct evidence which could conceivably indicate appellee's knowledge that the saddle girth was defective was the remark made by the young man, Eugene, that, "this is the same thing that happened to my Pap." There was no testimony regarding what that "same thing" might have been, or when or where that "same thing" might have happened. The remark could have concerned an incident at Western Trails or somewhere else. It could have referred to an incident in recent weeks or at some remote time. It could have referred to an individual falling off a horse or being thrown by a horse, a saddle falling off a horse, or a girth becoming unfastened or breaking. It could even have referred to the fact "Pap" recently sustained an injury. It could have referred to the very horses in question or any other horses. In sum, there was no relevant testimony explaining the import of this remark. There was simply not sufficient direct evidence to raise the

inference appellee had been forewarned of any defect in the equipment.[2]

Having concluded that the evidence was inadequate to demonstrate appellee breached the duty it owed appellants as business invitees, we will now determine whether appellee breached the duty it owed appellant in its capacity as the owner of domestic animals.

Under Maryland law, the owner of a domestic animal may be liable under two separate theories of liability for injuries caused by his animal—strict liability or negligence. *Slack v. Villari*, 59 Md.App. 462, 470, 476 A.2d 227, *cert. denied*, 301 Md. 177, 482 A.2d 502 (1984). In order to hold an animal owner strictly liable for injuries caused by his animal, a plaintiff must demonstrate the owner knew or, with reasonable care, should have known that the animal had a propensity to commit the particular type of mischief that was the cause of harm. *Finneran v. Wood*, 249 Md. 643, 648, 241 A.2d 579 (1968); *Herbert v. Ziegler*, 216 Md. 212, 216, 139 A.2d 699 (1958); *Twigg v. Ryland*, 62 Md. 380, 386 (1884); *Slack, supra*, 59 Md.App. at 470, 476 A.2d 227. Appellant, in his pleadings, did not allege that appellee should be held strictly liable for the injuries appellant suffered. In any event, as previously mentioned, there was no evidence appellee knew or with reasonable care should have known that Gregory's horse had a propensity to be frisky or that "Noble," appellant's horse, was inclined to rear up.

This case is a far cry from the situation involved in *Herbert v. Ziegler, supra*. In *Herbert*, the owner of a riding academy appealed from a judgment below holding him liable for the injury sustained by a patron of his riding academy. The appellee, a patron, mounted a horse named

---

**2.** The saddle itself was not described. Appellant's reference to the saddle horn indicates that it was probably a western style saddle. There was nothing in the evidence to indicate how the girth was attached to it, much less how it became detached, *i.e.*, whether the leather itself broke or tore or the stitching gave way.

"Chubby." A man identified at trial as an employee was adjusting the horse's stirrups when a dalmation named "Poppy," belonging to appellee, came running at Chubby's legs. Chubby bolted and the patron was thrown onto the ground. Very shortly after the accident, appellant's employee explained the incident to his employer, saying "Poppy scared Chubby again." The Court of Appeals, affirming the judgment below, held that the remark of appellant's employee indicated his employer's knowledge of the propensity of Chubby to be frightened by Poppy. His statement, it urged, was part of the *res gestae*, because it was made by one who had observed the incident immediately after the incident's occurrence. The use of the word "again" permitted the inference similar episodes had occurred before. The reference to the particular animals involved showed that the accident occurred as the result of the repetition of Chubby's propensity to be frightened by Poppy.

In the case *sub judice*, the statement, "this is the same thing that happened to my Pap," was not made by one who was present at the time of the accident. Moreover, no reference to the animals themselves or to their particular propensities was made. It is thus difficult to consider this statement a part of the *res gestae.*

An animal owner may be liable under a negligence theory even where he is unaware of any mischievous propensity on the animal's part, if he has failed to exercise reasonable care in controlling the animal or preventing the harm caused by him. *Slack, supra,* 59 Md.App. at 470, 476 A.2d 227. *See also Arnold v. Laird,* 94 Wash.2d 867, 621 P.2d 138, 141 (1980) (*en banc*). In order to be deemed negligent in failing to prevent the harm caused by an animal, one must be shown to have exercised "ineffective control of an animal in a situation where it would reasonably be expected that injury would occur, and injury does proximately result from the negligence. The amount of control required is that which would be exercised by a reasonable person based upon the total situation at the time, including the past behavior of the animal and the

injuries that could have been reasonably foreseen." *Slack,* 59 Md.App. at 482, 476 A.2d 227 (Alpert, J., dissenting) (quoting *Arnold, supra,* 621 P.2d at 141).

 In the case *sub judice,* the evidence shows appellant and his son Gregory were on their horses at the time of the incident. Gregory testified that his horse was "jumpy" and "frisky" after its run in the field and that he was having difficulty controlling it just prior to the time his horse kicked his father's. On direct examination, when asked whether he had received any instruction from the trail guide, Gregory testified he was instructed that "if the horse acts up or anything, pull back on the reins." He did not state when he received this instruction, that is, whether he received the instruction during the initial trail ride or during the trail ride resumed after the boys' return from their run. Several other members of appellant's family similarly testified that Gregory's horse was frisky just before it kicked appellant's horse.

There is differing testimony as to the length of time which elapsed between the return of the boys from their run and the kicking incident. Gregory, in response to the court's questioning, testified "we had just come back and the guide said, 'okay we're going to be on our way' and like, I think it wasn't two minutes after that my dad was on the ground." Appellant's son Michael testified that "as soon as we got done running the horses, my brother's horse ... jumped up and kicked my dad." Then later, Michael indicated the family had only resumed its trail ride for about three to four minutes when the incident occurred. Mrs. Pahanish testified that after the guide and boys returned from their run, "we went off the road onto this field and it was just up a—a few feet into this field ... and all of a sudden I looked up and ... my son's horse had kicked my husband's horse...." Appellant testified that "when the boys came back we started out again, and just as we started out, Gregg's horse was jumping around, his horse tried to kick a couple other horses, but it pulled up beside mine—or in front of mine and kicked mine."

We do not believe the trial judge clearly erred in failing to determine the evidence presented demonstrated appellee ineffectively controlled the animals involved in the incident. Notably, there was no evidence the trail guide was aware of prior mischievous conduct on the part of the animals. There was no testimony respecting whether the trail guide was in a position, just prior to the accident, to observe the horse's friskiness. Even had the trail guide been aware of the problem, the testimony proffered would tend to support the conclusion that there was not sufficient opportunity to do anything about it.

## II

Appellant claims it was error for the trial court to have determined that the doctrine of *res ipsa loquitur* was inapplicable to the case at hand. Appellant argued that even assuming the absence of any direct evidence of negligence on the part of appellee, had the doctrine of *res ipsa loquitur* been applied, an inference of appellee's negligence would have arisen sufficient to require the appellee to rebut the inference. Specifically, appellant claims that the incident is of a type which would not ordinarily have occurred in the absence of negligence.

*Res ipsa loquitur,* which literally translated means "the thing speaks for itself," is a rule of evidence. When properly invoked, *res ipsa loquitur* permits, but does not compel, an inference of negligence. *Blankenship v. Wagner,* 261 Md. 37, 41, 273 A.2d 412 (1971); *Potts v. Armour & Co.,* 183 Md. 483, 487, 39 A.2d 552 (1944); *Gleason v. Jack Alan Enterprises, Inc.,* 36 Md.App. 562, 565, 374 A.2d 408 (1977). It permits the plaintiff in a negligence action to establish a *prima facie* case of negligence when he could not otherwise satisfy the traditional requirements for proof of negligence. *Stevens v. Union Memorial Hospital,* 47 Md.App. 627, 630, 424 A.2d 1118 (1981).

Under Maryland law, a claimant must demonstrate the following before the doctrine may be invoked: (1)

the injury is of a nature that would not ordinarily occur in the absence of negligence; (2) the defendant had exclusive control over the instrument which caused the injury; and (3) the plaintiff did not cause or contribute to the injury. *Giant Food, Inc. v. Washington Coca-Cola Bottling Company, Inc.*, 273 Md. 592, 597, 332 A.2d 1 (1975); *Blankenship, supra,* 261 Md. at 42, 273 A.2d 412; *Leikach v. Royal Crown Bottling Co. of Baltimore, Inc.*, 261 Md. 541, 547–48, 276 A.2d 81 (1971); *Stevens, supra,* 47 Md.App. at 631, 424 A.2d 1118; *Gleason, supra,* 36 Md.App. at 566, 374 A.2d 408; *Chesapeake & Potomac Telephone Company v. Hicks,* 25 Md.App. 503, 516, 337 A.2d 744 *cert. denied,* 275 Md. 750 (1975). If the plaintiff fulfills these requirements, the burden shifts to the defendant to go forward with evidence to rebut the inference which has arisen. The burden of proof, however, remains upon the plaintiff. *Blankenship, supra,* 261 Md. at 45, 273 A.2d 412; *Larsen v. Romeo,* 254 Md. 220, 225, 255 A.2d 387 (1969); *Leidenfrost v. Atlantic Masonry, Inc.*, 235 Md. 244, 250, 201 A.2d 336 (1963); *Munzert v. American Stores Company,* 232 Md. 97, 103, 192 A.2d 59 (1963).

Appellant in the case at hand was not entitled to have the *res ipsa loquitur* theory applied in that the injury complained of is not of a type which would not ordinarily occur in the absence of negligence. To be entitled to the invocation of the *res ipsa* doctrine, the claimant must show it is more probable than not that the injury sustained would have occurred as a result of negligence, rather than some other cause. *Leikach, supra,* 261 Md. at 542, 276 A.2d 81. An inference of negligence is not permitted if it is not shown that there is a greater likelihood the injury occurred as a result of the defendant's negligence. *Giant Foods, supra,* 273 Md. at 598–99, 332 A.2d 1. Where "the probabilities are at best evenly divided between negligence and its absence, it becomes the duty of the court to [conclude] that there is no sufficient proof." *Gleason, supra,* 36 Md.App. at 567, 374 A.2d 408 (quoting *Leikach, supra,* 261 Md. at 549, 276 A.2d 81).

We do not believe the trial judge clearly erred in finding that appellant was not entitled to invoke the doctrine of *res ipsa loquitur*. The incident involved herein could have resulted from non-negligent causes just as well as from negligent causes. As the Court of Appeals said in another context, "That horses are not especially intelligent, that they are easily startled or frightened, that their principal means of defense is to kick, although not now widely known, have for centuries been among the simple facts of life." *Finneran, supra,* 249 Md. at 648, 241 A.2d 579. So, too, when a horse approaches another horse from the side or rear and kicks it, it is among the simple facts of life that the horse kicked may rear even in the absence of negligence.

▆ Appellant contends on appeal that a horse's girth will not ordinarily break in the absence of negligence. The testimony below, however, did not establish that the girth did, in fact, break. We know nothing about the condition of the girth prior to or after the incident.

We have held that even where a defendant had a duty to inspect the instrumentality involved in a casualty, and even where the evidence sufficiently demonstrated that a defendant had failed to make proper inspection, negligence could not be established under the *res ipsa loquitur* doctrine unless it were also shown proper inspection would or should have disclosed the defect causing the casualty. *C & P Telephone, supra,* 25 Md.App. at 522, 374 A.2d 408. There was no showing a proper inspection would have revealed any defect in the saddle girth.

In light of the above, we hold that appellant was not entitled to have the *res ipsa* theory applied to his case.

### III

Appellant's next contention of error is that the lower court erred in failing to find that the violation by appellee of certain statutory licensing and inspection provisions established a *prima facie* case of negligence on appellee's part.

■■■■ In Maryland, the violation of a statute does not constitute negligence *per se.* *Hammond v. Robins,* 60 Md.App. 430, 435, 483 A.2d 379 (1984). Rather, the breach of a statutory duty may be considered some evidence of negligence where three requirements are met. First, the plaintiff must be a member of the class of persons the statute was designed to protect. Second, the injury suffered must be of the type the statute was designed to prevent. *Id.; Gardenvillage Realty Corporation v. Russo,* 34 Md.App. 25, 34, 366 A.2d 101 (1976). Third, the plaintiff must present legally sufficient evidence to demonstrate that the statutory violation was the proximate cause of the injury sustained. *Peterson v. Underwood,* 258 Md. 9, 15, 264 A.2d 851 (1969) (quoting *Austin v. Buettner,* 211 Md. 61, 70, 124 A.2d 793 (1956)); *Alston v. Forsythe,* 226 Md. 121, 129–30, 172 A.2d 474 (1961); *Liberto v. Holfeldt,* 221 Md. 62, 67, 155 A.2d 698 (1959); *Whitt v. Dynan,* 20 Md.App. 148, 154, 315 A.2d 122 (1974); *Hammond, supra,* 60 Md.App. at 435, 483 A.2d 379.

■■■ The testimony establishes that appellee was not licensed or inspected in the year in question, in breach of its duty under sections 2–710 and 2–713 of the Maryland Agriculture Code Annotated.[3] The appellant was also a member of the class the statute was designed to protect. A November 1, 1979, report prepared by the Department of Fiscal Services pursuant to the Regulatory Programs Evaluation Act of 1978 states that the Board of Inspection of Horse Riding Stables was created for the dual purposes of protecting the public from unsafe or unhealthy horses rented from horse stables and preventing cruelty to horses. While the statute proper is silent as to its purposes, other sections of

---

**3.** Section 2–710(a) of Md.Agric.Code Ann. (1985 & Supp.1986) provides, in pertinent part that: "[a] person may not engage in the business of operating or maintaining any horse riding stable unless the person has received a license and a certificate issued by the Board [of Inspection of Horse Riding Stables]." Sec. 2–713(a) of Md.Agric. Code Ann. (1985 & Supp.1986) requires that "[e]ach horse riding stable licensed under this subtitle shall be inspected at least annually."

subtitle 7 would appear to indicate that protection of the public was envisioned. Section 2–715(3) allows suspension or revocation of an operator's license where the licensee "[f]ails to provide suitable saddles, bridles, harnesses and other tack or equipment." Section 2–715(4) allows license suspension when the licensee "[a]llows unfit horses to be used for riding or driving purposes." It is also clear that the statute was designed to protect against the type of injury alleged to have occurred in this case. Appellant, however, has provided no circumstantial or direct evidence which would establish a causal link between the breach by appellee of his statutory duty and the injury actually sustained by appellant.

We will examine the evidence presented below. As mentioned previously, the evidence indicated appellee's stables were licensed in 1981 and 1982. In 1981 the inspection revealed a problem with uncleanliness of the stalls and that some of the reins hanging in the tack room needed to be replaced or oiled. The 1982 inspection report did not indicate any problem with the equipment. In 1984 there was a problem with stall uncleanliness again. The state inspector testified that in her 1984 report she noted that some of the equipment hanging in the tack room was adequate but could be better. She did not identify the equipment or testify how it might have been improved.

There was no evidence, however, which would tend to establish that the accident would not have occurred but for the failure of appellee to be licensed and inspected in the year in question. There is nothing to indicate that had appellee been licensed and its premises inspected such inspection would have revealed any defect in the equipment used on appellant's horse. There was no evidence presented respecting whether the alleged defect was of a type which would have been discoverable even had the equipment been examined on the morning of the injury. All in all, the evidence failed to demonstrate a causal link between the licensing and inspection violations and the injury sustained by appellant.

## IV

Appellant's final contention of error is that the court failed to find that the girth belt which allegedly broke when appellant's horse reared contained an unreasonably dangerous, latent defect for which appellee should be held strictly liable. The short answer to this claim is that appellant's pleadings sounded only in negligence and not in product liability. In any event, appellee was neither the manufacturer nor seller of the product. Thus, no product liability action could possibly have been brought against it. *See* Restatement (Second) of Torts § 402A (1965).

In summary, we conclude that the trial judge did not clearly err in finding that (1) there was insufficient direct evidence of negligence to withstand a motion for judgment; (2) the *res ipsa loquitur* theory was inapplicable and did not even permit, let alone compel, an inference of negligence on appellee's part; (3) the evidence was insufficient to demonstrate a causal link between appellee's breach of a statutory duty and the injury sustained by appellant. The products liability question, neither pleaded nor argued below, could not be raised for the first time on appeal.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.